# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

DOROTHY MUELLER,

                         Plaintiff,

-vs-                                                    Case No.  6:04-cv-348-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                         Defendant.

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Dorothy Mueller, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration.  Doc. No. 4.  This matter has been referred to me under 28 U.S.C. §

636(c) pursuant to the consent of the parties.

## I.        PROCEDURAL HISTORY.

On December 11, 2000, Mueller filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401 *et seq*.  TR. 85-87.  Mueller's claim was denied, initially and upon

reconsideration.  Mueller requested a hearing before an administrative law judge (ALJ), which was

held on July 14, 2003.  TR. 39-66.  Mueller, who was represented by an attorney, testified at the

hearing.  *Id*.  Robert D. SanFilippo, a vocational expert (VE), also testified at the hearing.  *Id*.

After considering the testimony and the medical evidence presented, the ALJ found that Mueller had not engaged in substantial gainful activity since August 11, 2000, the alleged onset date of her disability.  TR. 21.  The ALJ concluded that the medical evidence indicated that Mueller suffered from chronic obstructive pulmonary disease (COPD),[1] a history of myocardial infarction (MI),[2] mitral valve prolapse with mild regurgitation, coronary vasopastic disease (Prinzmetal angina),[3] gastroesophageal reflux disease (GERD),[4] status post hiatal hernia repair, bilateral carpal tunnel impingement, and back pain.  TR. 24.  The ALJ determined that Mueller's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  TR. 24.  The ALJ concluded that Mueller did not have any severe mental impairments.  TR. 24.

---

[1] COPD "is comprised primarily of two related diseases - chronic bronchitis and emphysema. In both diseases, there is chronic obstruction of the flow of air through the airways and out of the lungs, and the obstruction generally is permanent and progressive over time." MEDICINENET.COM, at http://www.medicinenet.com/chronic_obstructive_pulmonary_disease_copd/article.htm (last visited September 30, 2005).

[2] Myocardial refers to the middle layer of the heart, consisting of cardiac muscle. STEDMAN'S MEDICAL DICTIONARY 1167 (26th ed. 1995) (STEDMAN'S).  Infarction refers to a "[s]udden insufficiency of arterial or venous blood supply due to emboli, thrombi, vascular torsion, or pressure that produces a macroscopic area of necrosis; the heart . . . [is] likely to be affected, as are tumors, especially of the ovary or uterus." Id. at 868.

[3] Prinzmetal's angina is a form of angina pectoris, "characterized by pain that is not precipitated by cardiac work, is of longer duration, is usually more severe, and is associated with unusual electrocardiographic manifestation . . . ." STEDMAN'S at 83-84.

[4] GERD refers to gastroesophageal reflux disease, or a backflow of acid from the stomach into the swallowing tube or esophagus. INTERNATIONAL FOUNDATION FOR FUNCTIONAL GASTROINTESTINAL DISORDERS, ABOUT GERD, at http://www.aboutgerd.org (last visited Sept. 30, 2005).

The ALJ found that Mueller had the residual functional capacity (RFC) to "lift 20 pounds occasionally and 10 pounds frequently, sit, stand or walk for 6 hours in an 8-hour workday."[5]  TR. 26.  She was to avoid repetitive motion of the upper extremities.  She could occasionally climb, balance, stoop, kneel, crouch and crawl, but never climb a ladder, rope, or scaffold.  She should also avoid concentrated exposure to vibration, extreme cold and heat, and hazards.  TR. 26.  In reaching this determination, the ALJ relied heavily upon the opinions of "two State agency physicians" who reviewed Mueller's records and prepared physical RFC assessments at the request of the SSA.  TR. 25.  The ALJ accorded little weight to the opinion of Mueller's treating physician, Mark Webster, D.O., concluding that his "opinion is somewhat extreme and not consistent with the objective medical evidence."  TR. 26.

In addition, the ALJ found Mueller's "stated symptoms somewhat exaggerated over [w]hat would be expected based on the medical findings in the record."  TR. 25.  More specifically, the ALJ found Mueller's "testimony and subjective statements regarding her pain and limitations credible to the extent of establishing that she has a combination of severe impairments, but not fully credible to the extent of establishing that these impairments are so severe as to preclude her from performing substantial gainful activity . . . ."  *Id*.

---

[5] Pursuant to 20 C.F.R. § 404.1567(b), light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further provides that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  *Id*.

The ALJ noted that the VE testified that Mueller's past relevant work as a customer service clerk and a salesperson was light in physical demands and semiskilled in nature and that her work as cashier and as a collection clerk was sedentary in physical demands and semiskilled in nature. TR. 26.  The ALJ determined that Mueller's "past relevant work as a customer service representative, a cashier and as a collection clerk did not require the performance of work-related activities precluded by her residual functional capacity . . . ." TR. 27.  Consequently, the ALJ determined that Mueller was not disabled.  *Id*.

Mueller requested review of the ALJ's decision by the Appeals Council.  On January 10, 2004, the Appeals Council denied Mueller's request for review.  TR. 7-9.  This appeal timely followed.  Doc. No. 1.

**II.     JURISDICTION.**

The ALJ's decision became the final decision of the SSA once the Appeals Council denied Mueller's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

A.     *Mueller's Testimony*.

Mueller was born on October 28, 1944.  TR. 43.  Mueller submitted a disability report in support of her application for OASDI benefits in which she stated that she obtained a GED.  TR. 101.  However, at the hearing she testified that she never actually obtained her GED.  TR. 45.  Mueller completed a vocational program offered by Harrison Business School in 1978.  TR. 45,

101.  Mueller's prior work history included employment as customer service representative, a collection clerk, and a cashier.  TR. 46-49.

At the time of the hearing, which was held in July 2003, Mueller weighed approximately 170 pounds.  TR. 44.  She is approximately 5'7" inches tall.  *Id*.  She is left-handed.  TR. 56.

Mueller testified that she suffered from, among other things, COPD, mitral valve prolapse,[6] congestive heart failure, angina, degenerative disk disease, carpal tunnel syndrome in both wrists, acid reflux, and a spastic colon.  TR. 49-50.  She had arthritis in her joints, shoulder, elbows, back and spine.  TR. 55.  Mueller suffered a heart attack in 2000.  TR. 46.

Mueller stated that she experienced pain in her back all the time and that she experienced other "pains that come and go."  TR. 51.  Mueller's stomach caused her severe pain when it went "into spasm."  *Id*.  Muller had trouble walking.  She stated that walking short distances made it difficult for her to breathe.  *Id*.  She used a scooter to help her walk.  TR. 52.  She sometimes became lightheaded.  TR. 51.  Mueller used a nitroglycerin spray at least three times a month to treat her angina.  TR. 58.  In a written report, Mueller indicated that when she had attacks related to heart or colon problems, she had to rest for a couple of days.  TR. 75.

Mueller had trouble standing and sitting for long periods.  *Id*.  Specifically, she testified that she was unable to sit for longer than two hours at a time due to stiffness in her legs.  Mueller was able to stoop but she could not squat or bend.  She was unable to use stairs both due to back

---

[6]  The transcript reflects that Mueller testified that she suffered from MBP, but it appears based on the medical records that the proper transcription would be MVP.  TR. 50.  In other portions of the record, Mueller referred to MVP as mitral valve prolapse.  TR. 75.

pain and difficulty breathing.  Mueller had difficulty catching her breath "quite frequently" throughout the course of a normal day with routine activity.  TR. 52-53.

Mueller had trouble grasping or holding objects.  *Id*.  Her hands swelled when she performed repetitive fingering or handing.  TR. 56.  Her left hand swelled when she tried to write.  TR. 56.  She also had pain in her wrist and hand when using a computer or adding machine.  TR. 125.

Mueller was able to drive short distances.  TR. 44.  She prepared her own meals, with the assistance of he husband.  TR. 53.  Mueller had trouble performing routine household chores, such as vacuuming, making the bed and trying to clean the tub due to pain and difficulty breathing.  *Id*.  She had trouble sleeping.  She needed to take naps for "[a]n hour . . . to two hours" during the day.  TR. 54.  She was easily exhausted.  TR. 54.

At the time of the hearing, Mueller did not have health insurance and she was "maxed out on all [her] credit cards [from] buying [her] medicine and paying for Dr. Webster."  TR. 51.

On a typical day, Mueller would wake up, take her medicine, get something to eat, do the dishes, and sit in a chair and watch TV.  TR. 54.  She had trouble concentrating when she watched television.  She also had memory problems.  TR. 54-55.

Mueller was unable to tolerate inclement weather.  She stated that "[i]f it's too hot or too cold outside, as soon as [she] step[s] out the door, it feels like somebody stuck a knife in [her]

chest." TR. 55.  Rain also had a negative impact on her back, wrists, arms, and fingers.  TR. 55.

      B.    *Medical Evidence*.[7]

Mark Webster, D.O., treated Mueller from at least early 1999.  A progress note dated January 13, 1999, reflects that Mueller had GERD, hypertension, and dizziness, among other things.  TR. 361.  In June 1999, she complained of epigastric pain, which Dr. Webster determined was the result of a colonic spasm.  TR. 358.  In August 1999, Mueller complained of shortness of breath and chest tightness, with fatigue.  Dr. Webster's impression was angina pectoris, and he started her on nitroglycerin.  TR. 356.  Her complaints of angina continued through September 1999.  TR. 355.  Sometime in 1999, the date being unclear in the records, Dr. Webster administered an echocardiogram that revealed mild mitral valve prolapse with mild mitral and aortic regurgitation.  TR. 378.  In October 1999, Mueller complained of esophageal pain, which improved with medication.  TR. 353-54

Between July 7, 1999, and December 15, 2000, Mueller was treated by Lenkala Mallaiah, M.D., at Mid-Florida Gastroenterology Group.  TR. 181-85, 188-90.  Dr. Mallaiah's notes reflect that Mueller had coronary artery disease, hiatal hernia, erosive esophagitis[8] and intense esophageal spasms secondary to esophagitis, spastic colon, and internal hemorrhoids.  She was treated with Protonix and Prevacid.  TR. 181, 183, 184, 188.

---

    [7] I will not review the evidence regarding Mueller's mental impairments because she does not challenge the ALJ's assessment that these impairments were not severe.

    [8] "Inflamation of the esophagus."  STEDMAN'S at 598.

On July 16, 1999, Dr. Mallaiah performed a esophagogastroduodenoscopy[9] on Mueller. TR. 186-87.  Dr. Mallaiah noted that the lower two-thirds of Mueller's esophagus showed diffuse esophagitis with the lower one-third showing erosions.  Dr. Mallaiah's impression was that Mueller suffered from esophagitis and hiatal hernia.  TR. 186.

On April 6, 2000, Mueller told Dr. Webster about a near syncopal episode following a severe headache.  TR. 348.  On April 14, 2000, James J. Linville, M.D., performed a bilateral color doppler carotid ultrasound on Mueller.  TR. 372.  Dr. Linville's conclusion was that Mueller had 1-15% stenosis in both internal carotid arteries.  *Id*.

On April 27, 2000, Mueller was seen by David Joseph, M.D., who performed a nuclear stress test.  TR. 139.  Dr. Joseph noted that Mueller had mild mitral regurgitation and aortic regurgitation.  TR. 139.  On May 1, 2000, Mueller returned to Dr. Joseph complaining of chest pain and shortness of breath when she arrived, but the pain was almost gone by the time she saw Dr. Joseph.  Dr. Joseph's impression was that Mueller's chest pain was probably the result of a coronary spasm.  TR. 140.[10]  He observed that shortness of breath was not explained by Mueller's heart problems, and that there might be an anxiety component to the symptom.  TR. 140.

---

[9] An esophagogastroduodenoscopy is an examination of the lining of the esophagus, stomach, and upper duodenum with a small camera (flexible endoscope) which is inserted down the throat. MEDLINE PLUS, at http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm (last visited Sept. 30, 2005).

[10] I note that Dr. Webster writes in later reports that Mueller had an acute myocardial infarction in April 2000.  TR. 445.

Dr. Webster's treatment notes dated June 1, 2000, include a diagnosis of mitral valve prolapse (MVP).  TR. 345A.  Beginning in August 2000, his treatment notes also include a diagnosis of Prinzmetal angina.  TR. 338.

On July 21, 2000, Kalyani Gaddipati, M.D., performed a esophagogastroduodenoscopy with biopsy on Mueller.  TR. 144-47.  Dr. Gaddipati wrote that Mueller's symptoms had improved with the use of Prevacid, but that she had been required to change medications, which caused her symptoms to recur.  TR. 144.  Dr. Gaddipati opined that Mueller suffered from mild distal esophagitis and streaky antral gastritis[11] with one to two erosions.  TR. 145.  He recommended that Mueller again use Prevacid.  TR. 145.

On August 23, 2000, Mark Webster, D.O., noted that Mueller suffered from frequent angina attacks, that were severe and disabling.  TR. 340.  Dr. Webster's prognosis for total recovery was poor.  He opined that Mueller's was "totally disabled from any gainful occupation" and his prognosis was "not favorable for longterm outcome."  *Id*.

In September 2000, Mueller complained to Dr. Webster of repeated angina attacks.  She also had shortness of breath, tiredness, fatigue and pain in her left arm.  His assessment was Prinzmetal angina and bronchitis.  TR. 337.  These complaints continued through December 2000.  TR. 336.  In December 2000, Dr. Webster recommended that Mueller not work.  TR. 336.

In September 2000, Dr. Mallaiah wrote that medication completed resolved the symptoms of esophagitis.  TR. 184.  However, in November 2000, Mueller was again complaining of chest

---

[11] "Inflamation, especially mucosal, of the stomach."  STEDMAN'S at 707.

pain and frequent acid reflux.  TR.  183.  Dr. Mallaiah's impression was erosive esophagitis.  TR. 182.

On October 3, 2000, Mueller was examined by William David, M.D., a cardiologist  TR. 224-26.  At the time of the examination, Mueller was not in distress.  Dr. David's assessment was that Mueller had a history of Prinzmetal's angina, history of bronchitis, history of rheumatic fever, history of bronchial asthma, and that she suffered from obesity, hypertension, hiatal hernia with gastroesophageal reflux and associated gastritis, and esophagitis.  TR. 225-26.  Dr. David noted that he had no reservations with Mueller returning to work, assuming review of her films was acceptable.  He wrote that even an individual with advanced disease could perform essentially non-exertional desk work.  TR. 225.

On October 17, 2000, Mueller was admitted to Florida Hospital Fish Memorial (FHFM). TR. 148-50.  Mueller complained of chest pain, shortness of breath, and nausea.  TR. 148.  Before coming to the hospital, she had a headache and lightheadedness, with tingling in her arms and legs. TR. 155.  She reported that she had been taking Prevacid once a day.  TR. 153.  The emergency room physician's diagnostic impression was unstable angina.  TR. 150. Mueller was also seen by Dr. Webster while at FHFM.  TR. 151-52.  Dr. Webster's final diagnosis was acute chest pain, history of Prinzmetal angina, and probable esophageal spasms and/or GERD.  TR. 152.  Mueller was treated with Prevacid, Cartia XT, Plavix, Hytrin, Tranxene and Gaviscon.  *Id*.

Two consulting physicians also rendered opinions regarding Mueller's condition after examining her while she was at FHFM.  TR. 153-59.  Specifically, Dr. David opined that Mueller suffered from atypical chest pain "clearly not related to ischemic heart disease."  TR. 158.  Dr.

-10-

David noted that "[b]ased on [Mueller's] normal catheterizations, left ventricular function, lack of electrocardiogram changes during symptoms, and two stress tests which show normal myocardial perfusion she has a normal cardiovascular status . . . ." *Id*. Dr. David further opined that Mueller had a questionable history of Prinzmetal's angina, questionable mitral valve prolapse, hypertension, well controlled on Cartia, history of chronic bronchitis, history of hiatal hernia with erosive esophagitis treated with Prevacid, obesity, and history of cervical spinal disc protrusion status post diskectomy and C5-C6 fusion which could cause multiple episodes of chest and neck pain. TR. 159. Dr. Mallaiah noted that Mueller's cardiac evaluation revealed no acute cardiac problem. TR. 154. Dr. Mallaiah opined that Mueller was suffering from "noncardiac" related pain. *Id*.

On November 29, 2000, Mueller admitted to Central Florida Regional Hospital (CFRH). TR. 166-67. Mueller complained that she was experiencing substantial chest pain radiating to her jaw and left shoulder. TR. 166. The attending physician, Michael A. Depauw, D.O., noted that Mueller's heart rate was regular and that her lungs were clear to auscultation. His diagnosis was unstable angina pectoris. *Id*.[12]

Mueller was also seen by Carlos Grullon, M.D., and Clarence Scott, M.D., while at CFRH. TR. 169-74. Dr. Grullon note that Mueller had a history of known peripheral coronary disease based on cardiac catheterization finds from April and September of 2000, history of sliding hiatal

---

[12] Angina pectoris is defined as "severe constricting pain in the chest, often radiating from the precordium to a shoulder (usually left) and down the arm, due to ischemia of the heart muscle usually caused by coronary disease." STEDMAN'S at 83.

hernia, esophagitis, history of cervical laminectomy in the past, history of depression, and history of mitral valve prolapse diagnosed in 1997. TR. 170.

Dr. Scott noted, among other things, that Mueller had a cervical diskectomy performed in 1992, a repeat diskectomy fusion in 1993, and a heart catheterization in April 2000, with 35% blockage in the left main and 30% blockage in the right coronary artery. TR. 172. Dr. Scott's impression was that Mueller suffered from coronary artery disease/Prinzmetal's angina, Vincent's angina, hypertension, irritable bowl syndrome and gastroesophageal reflux. TR. 174.

A pulmonary function test performed on December 19, 2000, revealed that Mueller had mild restrictive airway disease, mild obstructive airway disease with minimal improvement after bronchodilator therapy, and that her diffusion capacity for carbon monoxide was mildly reduced. TR. 368.

Throughout 2001 and 2002, Mueller complained to Dr. Webster of headaches, near syncopal episodes, angina, heart palpitations, and severe GERD and spastic colon symptoms, sometimes with diarrhea or constipation. TR. 309, 312, 322, 325, 329, 332, 334, 446. There are also recurring complaints of shortness of breath on exertion. TR. 320, 324, 328, 447.

On January 17, 2001, Dr. Linville examined Mueller's chest x-rays and concluded that she had COPD. TR. 366.

On January 19, 2001, Mueller had a follow-up visit with Dr. David. She reported infrequent episodes of chest discomfort, which were resolved with sublingual nitroglycerin. TR. 223. On March 6, 2001, Dr. David wrote that Mueller did have chest discomfort of ischemic and

non-ischemic origin.  He opined that her ability to sit, stand, walk, lift, carry, travel and socially interact was "fine."  TR. 222.

On February 8, 2001, John W. Robertson performed laparoscopic surgery on Mueller.  TR. 191-92.  He noted that Mueller suffered from severe gastroesophageal reflux with reactive airway disease.  TR. 191.

On February 17, 2001, Mueller was treated at the FHFM emergency room.  TR. 206-12. Her chief complaint was chest pain radiating to her left arm.  TR. 206.  The attending physician's assessment was acute chest pain and angina.  TR. 207.  An electrocardiogram showed a normal sinus rhythm with no evidence of acute ischemia and x-rays of Mueller's chest were negative.  TR. 207.

On April 30, 2001, A.W. Barber, M.D., examined Mueller at the request of the SSA.  TR. 213-18.  Mueller complained of chronic fatigue, decreased bladder and bowel control, and angina. TR. 213.  Dr. Barber noted that Mueller had difficulty walking.  She had elastic support on her left ankle, and she walked with a limp.  She was unable to walk on her toes and heels.  Mueller was also unable to squat.  Dr. Barber's impression was that Mueller suffer from GERD - under control, post myocardial infarction (MI) with persistent angina, and depression.  TR. 216.  He opined that Mueller was unable to walk, stand, and sit for long periods of time without complaints of pain. She was unable to lift or carry heavy objects.  Dr. Barber noted that Mueller's "[s]ymptoms could limit [her] to activities and occupation not requiring long periods of standing but possibly requiring use of upper body movements and coordinated activities with hands.  *Id*.

-13-

On May 11, 2001, Dr. David examined Mueller.  She reported that she was having palpitations but only occasional episodes of angina, which were relieved with sublingual nitro spray.  TR. 220.  Dr. David opined that Mueller suffered from Prinzmetal's angina and hypertension, both of which were controlled.  She also had exogenous obesity, history of bronchial asthma, and history of gastroesophageal reflux status post repair.  TR. 220.   A Holter Monitor test revealed that Mueller's complaints of shortness of breath and chest pain did not correlate with any arrhythmic disturbance.  TR. 219.

In May and June of 2001, Mueller was seen and treated by several different physicians at FHFM.  TR. 233-34, 239-42, 244-59.  Specifically, John Robertson, M.D., examined Mueller and noted that she was experiencing abdominal pain.  TR. 233.  Dr. Robertson's impression was colonic obstruction possibly related to constipation versus diverticular disease.  TR. 234.

On May 27, 2001, Mueller complained of severe chest pain, which Dr. David opined appeared to be non-cardiac in origin.  TR. 232.  However, when Mueller returned on June 3, 2001, again complaining of chest pain, Dr. Webster opined that it was cardiac in origin.  TR. 253-55.

On May 31, 2001, Dr. Mallaiah performed another esophagogastroduodenoscopy on Mueller, which disclosed distal esophagitis.  TR. 239-40.  On June 6, 2001, Dr. Mallaiah performed a colonoscopy on Mueller.  TR. 248-50.  The colonoscopy revealed a spastic colon and internal hemorrhoids.  TR. 248.

On August 3, 2001, Mueller was examined by John L. Walker, M.D.  TR. 266.  Dr. Walker administered an exercise test.  Dr. Walker opined that Mueller had "low physical work capacity." *Id*.  Mueller did not complain of chest pain.  TR. 266.

-14-

An examination performed on August 14, 2001, revealed that Mueller had cardiomegaly.[13] TR. 326.

On April 2, 2002, Dr. Webster submitted a statement concerning Mueller's residual functional capacity.  TR. 316.  Dr. Webster opined that Mueller was unable to perform any work activity based on an eight-hour workday.  *Id*.  Dr. Webster noted that Mueller had a "significant cardiac problem which is unpredictable as to when it occurs, but is frequent enough to require ongoing [medication] including nitro patches -.6 mg."  *Id*.

On February 3, 2003, Mueller was admitted to Florida Hospital DeLand.  TR. 396-408. Her chief complaint was chest pain and shortness of breath.  TR. 398.  The diagnostic impression of the attending emergency room physician, Allen Jones, M.D., was congestive heart failure.  *Id*. Mueller's diagnosis upon discharge was dyspnea, etiology unclear, coronary artery disease, history of mitral valve prolapse, history of rheumatic fever in the past, spastic colon, history of gastroesophageal reflux disease, and history of chronic obstructive pulmonary disease.  TR. 396, 398.  An Echo/Doppler report revealed mild mitral and tricuspid regurgitation.  TR. 400. However, Oscar D. West, M.D., a cardiologist, opined that Mueller's symptoms were likely pulmonary in origin, probably representing both pleurisy and obstructive airway disease.  TR. 402.

On July 30, 2003, Dr. Webster prepared a physical functional assessment of Mueller.  TR. 451-52.  Dr. Webster opined that Mueller could stand for a total of two hours in an eight hour workday at one-half hour intervals, sit for a total of three hours at one hour intervals, and walk a total of one block at one-half block intervals.  She needed to move around and lie down during the

---

[13] "Enlargement of the heart."  STEDMAN'S at 281.

day.  TR. 451.  She could occasionally lift five pounds.  She could never perform any activities involving climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling or the use of her legs.  She could occasionally push and pull and use her arms.  *Id*.  Mueller was to avoid all exposure to extreme cold, heat, wetness/humidity, vibration, fumes, noxious odors, dust, mist, gases, poor ventilation, proximity to moving mechanical parts, and working in high exposed places.  TR. 452.  He based this assessment on Mueller's COPD and congestive heart failure, the clinical findings of which indicated that both conditions had worsened.  TR. 452.

  C. *Reviewing Physicians*.

  On August 15, 2001, Donald Warren Morford, M.D., reviewed Mueller's records and prepared a physical residual functional capacity assessment at the request of the SSA.  TR. 280-87.  Dr. Morford noted that Mueller suffered from, among other things, GERD.  TR. 281.  Dr. Morford opined that Mueller could frequently lift ten pounds and occasionally lift twenty pounds.  She could sit, stand or walk (with normal breaks) six hours a day.  TR. 281.  Her ability to push and/or pull was unlimited.  *Id*.  Dr. Morford opined that Hicks could occasionally balance, stoop, crouch, kneel, crawl and climb ramps or stairs.  TR. 282.  She was unable to ever climb ladders, ropes or scaffolds.  *Id*.  Mueller was to avoid concentrated exposure to extreme heat, cold and hazards, such as machinery and heights.  TR. 284.

  On January 7, 2002, Eric C. Puestow, M.D., reviewed Mueller's records and prepared a physical residual functional capacity assessment at the request of the SSA.  TR. 301-08.  Dr. Puestow opined that Mueller could frequently lift ten pounds and occasionally lift twenty pounds.  She could sit, stand or walk (with normal breaks) six hours a day.  TR. 302.  Her ability to push

and/or pull was limited to "no repetitive motion" as to her upper extremities.  *Id*.  Dr. Puestow

opined that Mueller could occasionally balance, stoop, crouch, kneel, crawl and perform climbing

activities due to fatigue.  TR. 303.  Mueller was to avoid concentrated exposure to vibration.  TR.

305.

   D. *Vocational Expert Testimony*.

   The vocational expert (VE) was asked to assess the work-related abilities of a hypothetical

individual of Mueller's age, education and experience based on a variety of functional capacity

assessments.  The VE opined that such a person with the following limitation could return to

Mueller's past work as a customer service representative, cashier and collection clerk: lift twenty

pounds occasionally and ten pounds frequently; sit, stand, or walk six hours in an eight-hour

workday; limited ability to push/pull with the upper extremities and no ability to do repetitive

push/pull with the upper extremities; occasionally climb, balance, stoop, kneel, crouch, or crawl

due to fatigue; and, avoid concentrated exposure to vibration.  TR.  60.  However, if this

hypothetical person could not do any repetitive movements with the upper extremities, the VE

opined that the individual could not do any of Mueller's past relevant work.  TR. 61.[14]

   The ALJ then asked the VE to add to the original hypothetical, assuming that repetitive

motion referred to ability to push/pull only, the restriction of never climbing ladders, ropes, or

scaffolds and avoid extreme cold and heat and hazards.  The VE testified that such a person could

still perform Mueller's past relevant work.

---

   [14] The ALJ then asked the VE the following question: "Would there be any work that she could do if she couldn't do repetitive motion with her hands at all?"  TR.  61.  The VE responded that there would be no work she could do.  *Id.*

The ALJ then asked the VE to assume that the individual could not walk, stand, or sit for long periods of time, was unable to lift or carry heavy objects, but might be able to use the upper body and hands.  He opined that this individual could perform Mueller's past relevant work as a collections clerk.  TR. 62-63.

Finally, the ALJ asked the VE to assume that Mueller's testimony about the extent of her functional limitations was credited.  TR. 63.  The VE opined that if these limitations occurred on a consistent basis such a person could not perform Mueller's past relevant work or any other available work.  TR. 62-63.

## IV.    STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards.  *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1987) (per curiam).  While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision.  *Id*. at 1000.  Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence.  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The Court may not reweigh the evidence or substitute its own judgment for that of the SSA.  *Id*.  When reviewing a final

-18-

decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."[15]  Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits.  In sum, when evaluating a claim for benefits under OASDI, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?[16]

---

[15] 42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

[16] 20 C.F.R. § 404.1520(a)(4).  In an OASDI case, a claimant must establish that he or she was disabled during the time that she was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."[17]

## V.    ANALYSIS.

Mueller raises three issues on appeal.  First, Mueller contends the ALJ erred by misinterpreting the VE's testimony at the hearing.  Doc. No. 11, at 8.  Next, Mueller asserts that the ALJ erred by improperly evaluating her subjective testimony of pain and resulting functional limitations.  *Id.* at 13.  Finally, Mueller argues that the ALJ erred in finding that she was not totally credible "when the record clearly reveals that [she] suffered from documented impairments causing severe pain and limitations."  *Id.* at 14.  These are the only issues I will address.

A.    *Vocational Expert Testimony.*

One of the functional limitations the ALJ included in her RFC assessment was that Mueller was to avoid repetitive motion of her upper extremities.  The VE testified that if this limitation related only to repetitive push/pull motions, Mueller could return to her past relevant work.  However, if the limitation required Mueller to avoid all repetitive motion of her upper extremities, she could not perform her past jobs.  Mueller contends that the latter interpretation is consistent with the ALJ's functional capacity assessment.

It seems clear from reading the testimony of the VE in full, that the ALJ classified the limitation of no repetitive motion under the limitations on ability to push or pull.  Indeed, when the ALJ questioned the hypothetical limitation on repetitive motion, the ALJ stated as follows: "We're

---

[17] *See, e.g., McDaniel*, 800 F.2d at 1030.

taking about pushing and pulling, limited motion in the upper extremities, to no repetitive motion. So, it's under the push/pull section." TR. 60. Because the same ALJ who provided this definition of the repetitive motion limitation to the VE is the ALJ who rendered the decision in this case, it is reasonable to assume that the ALJ intended the RFC limitation of no repetitive motion to apply to push/pull activities. Therefore, I conclude that the first argument raised by Mueller is unavailing.

      B.    *Pain and Credibility*.

      Mueller's last two arguments are interrelated. She contends that the ALJ erred by discrediting her complaints of pain and other subjective symptoms because she had medical impairments that could reasonably be expected to cause pain and other symptoms and none of her doctors regarded her complaints as exaggerated.

> The appropriate legal standard for evaluating a claimant's subjective complaint of pain is for the [Commissioner] . . . to consider a claimant's subjective testimony of pain if [she] finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) [that] the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986) (citation omitted).

*Walker v. Bowen*, 826 F.2d 996, 1004 (11th Cir. 1987). If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (internal quotation marks omitted). If the Commissioner discredits the claimant's subjective testimony, "he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62. A clearly articulated

-21-

credibility finding with substantial supporting evidence in the record cannot be disturbed by a reviewing court. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

In this case, the ALJ found that there were underlying impairments that could cause the complaints of pain and other subjective symptoms about which Mueller complained. However, the ALJ found that the pain and other symptoms were not as limiting as Mueller believed them to be. The ALJ accurately articulated the medical evidence regarding the severity of Mueller's symptoms. She noted that Dr. David, a treating cardiologist, consistently opined that Mueller's impairments would not limit her ability to sit, stand, walk and the like.

The ALJ also articulated good cause for giving little weight to the functional capacity opinion expressed by Dr. Webster, another treating physician. She correctly stated that Dr. Webster's opinion was "somewhat extreme." TR. 26. As noted above, Dr. David concluded that Mueller could work. Dr. Barber, a consulting physician, also opined that Mueller could work, although Dr. Barber concluded that Mueller's symptoms could limit her to jobs not requiring long periods of standing. I note that the VE testified that Mueller could perform at least one of her past, relevant jobs even if she could not stand, walk or sit for long periods of time because that work was sedentary in nature. TR. 63.

The job of this Court is not to reweigh the evidence. Rather, I must determine whether the ALJ applied the correct legal principles and whether substantial evidence supports the conclusions she reached. I find that the ALJ followed the pain standard applicable in this circuit, and that substantial evidence supports her conclusion regarding Mueller's RFC. Based upon the testimony

-22-

of the VE, the ALJ properly concluded that Mueller could return to her past relevant work.  As such, the decision that Mueller is not disabled must be affirmed.

**VI.     CONCLUSION.**

For the reasons stated above, the decision of the SSA is **AFFIRMED**.  It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 30th day of September, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties